**AFFIDAVIT OF TASK FORCE OFFICER KATHLEEN DOYLE IN SUPPORT OF
AN APPLICATION FOR A CRIMINAL COMPLAINT**

I, KATHLEEN DOYLE, having been sworn, state:

***INTRODUCTION AND AGENT BACKGROUND***

1.  I am a Police Officer with the Newton Police Department. I have been a police officer for twenty years, and am currently assigned as a task force officer with the FBI Human Trafficking/Child Exploitation Task Force. I hold a Master of Science degree in Criminal Justice from Western New England University, and a Bachelor of Arts degree in Sociology from Boston College. In addition to my police academy training and my annual in-service training, I have completed numerous courses in specialized police training involving all aspects of investigative work. This includes training organized by the Federal Bureau of Investigation, U.S. Department of Homeland Security, Middlesex County District Attorney's Office, the Massachusetts Attorney General's Office, the Massachusetts State Police, the Massachusetts Department of Fire Services and the Massachusetts Police Training Committee. Over the course of my career, I have participated in the investigation of hundreds of serious crimes, including investigations of threats, larceny, felony assaults, armed robbery, rape, human trafficking, and homicide.

2.  From my training and experience, I know that individuals are trafficked for several purposes. Some of these purposes are subjection into involuntary servitude, peonage, debt bondage and slavery. Human trafficking is often accomplished through the use of fraud, force and coercion. I am familiar with the federal and state laws which make it a violation to engage in human trafficking, such as 18 U.S.C. §§ 1581 through 1595 (Peonage, Slavery and Trafficking in Persons), 18 U.S.C. §§ 2421 through 2428 (Transportation for Illegal Sexual Activity and Related Crimes).

3.  On or about February 13, 2020, Bruce Brown a/k/a "Arki" (hereinafter,

"BROWN") was indicted on charges of sex trafficking by force fraud and coercion, sex trafficking of a minor, conspiracy to commit sex trafficking, and transportation of a minor across state lines, in violation of 18 U.S.C. §§ 1591, 1594(c), and 2423(a). *See United States v. Bruce Brown*, Criminal No. 20-10041-PBS. On or about February 19, 2020, the FBI arrested BROWN; the same day, he made his initial appearance before the Honorable M. Page Kelley, United States Magistrate Judge, who informed him of the charges against him. BROWN was detained by consent (without prejudice) pending trial. He also was warned by the Court expressly at his arraignment on February 19, 2020 about the seriousness of tampering with victims and witnesses.[1]

    4.    I make this affidavit in support of a criminal complaint charging BROWN with obstruction of justice and witness tampering, in violation of 18 U.S.C. §§ 1503 and 1512 (b)(1), (b)(2)(A), (c)(2).

    5.    The facts in this affidavit come from my personal involvement and review of records in this investigation; interviews with witnesses; my training and experience; and information provided by others, including other agents, law enforcement officers, witnesses, and other sources of information gathered through my investigation. In submitting this affidavit, I have not included every fact known to me about this investigation. Rather, I have included only

---

[1] The government declined to expressly identify the charged victims and/or witnesses at the arraignment, but the dates referenced in the Indictment and BROWN's conduct makes clear that BROWN has knowledge of who at least some of the victims and/or witnesses are. The Court warned the defendant in part, "…other serious crimes that sometimes tend to happen when people are first charged are witness intimidation, and those kinds of things are taken very, very seriously. It's not just you who could be charged with them. Anyone associated with you who tries to reach out to someone and either prevent them from giving information to law enforcement or intimidate them is liable for a very, very serious charge, even more serious than what you are already charged with."

those facts that I believe are sufficient to establish probable cause.

## BACKGROUND

6. As evidenced by the conduct detailed herein, BROWN's current trial strategy is to intimidate, threaten, and/or corruptly persuade individuals who he believes are witnesses and/or victims in the above-captioned matter, with the intent to influence this case and the administration of justice, by influencing their testimony.

7. In a recorded jail visit on or about March 14, 2020, BROWN explicitly referenced his preference to combat the charges by "fighting it in the streets…I'd rather be in the street going to court", implying that he knows who the victims and/or witnesses in the above-captioned matter are. Based upon my training and experience, I believe BROWN recognizes that he has a history of manipulating the victims via force, fraud and coercion, and therefore believes he is more likely to have success approaching these individuals on his own than through intermediaries and through the confines of recorded phone calls and visits.

8. In furtherance of his scheme (which he refers to as "Plan B")[2], BROWN directed his longtime associates, including Co-Conspirator 1, Co-Conspirator 2, Co-Conspirator 3, and others known to law enforcement, to attempt to contact witnesses and/or victims.

9. Based upon my training and experience, I know that individuals who are incarcerated are often acutely aware that their jail calls are being recorded. I also know that at the beginning of each phone call inmates place, they receive warnings that their calls are subject to recording and monitoring. As such, inmates and the individuals they speak with often attempt

---

[2] On or about March 6, 2020, BROWN told Person 1 he had "to go to Plan B…fuck it". Person 1 asked BROWN "what the hell" Plan B was. BROWN stated "Well, I got to find two of the dudes, ya know what I mean, and try to talk to them, try to talk to them dudes, and say hey, it's a misunderstanding, ya know…I think that's what I'm gonna try to do." As discussed further below, BROWN uses the term "dude" as a code word.

to communicate in coded or veiled language, in an attempt to evade or deceive law enforcement. For example, individuals may purposefully change the gender of the person they are speaking about.

10. BROWN has extensive experience with the criminal justice system, and based upon my review of BROWN's jail calls, I believe BROWN is aware of and utilizes these tactics in communicating with his associates and co-conspirators. For example, as set forth herein, I believe BROWN uses the term "dude" to refer to victims and/or witnesses in this case. BROWN then provides more specific information in order to inform his co-conspirators which individual or "dude" he is referencing.

    **I.**    **Person 2 Receives Information that BROWN is Going to "Take People Out"**

11. Person 2[3] testified in the grand jury in connection with the above-captioned case. Person 2 also informed law enforcement that she notified BROWN's brother's wife[4], that she received a subpoena for testimony and had to testify.

12. On or about February 28, 2020, Person 2, at the insistence of her family, reported to law enforcement that she received information from an unidentified source that "Arki [Brown] was going to take people out who were involved in the case."

13. Person 2 is generally not cooperative with law enforcement, and refused to provide the name of the individual who told her this. She repeatedly stated that she would not do

---

[3] Person 2's criminal record includes convictions for operating with a suspended license (2018, 2017), multiple prostitution offenses, (2017, 2014, 2013), and disorderly conduct (2014). Person 2 was also charged with prostitution, and possession with intent to distribute a class B drug in 2019. As noted herein, Person 2 is generally not cooperative with law enforcement. Coupling this with the fact that Person 2 lacks motivation to lie to her family and law enforcement about a threat she received, I believe she is credible.

[4] The identity of this individual is known to the affiant, but omitted herein to maintain confidentiality.

so because she was in fear for her life.  Person 2 also provided law enforcement with conflicting information about the gender of the individual and method by which she was contacted.   Based upon my training and experience, I believe that Person 2 provided conflicting information to attempt to prevent law enforcement from determining who threatened her, in an effort to protect her own safety.

> **II.     BROWN Directs his Co-Conspirators to Contact Witnesses and/or Victims**

14.     In a recorded jail call on or about March 6, 2020, BROWN directed Co-Conspirator 1 as follows[5]:

> BROWN: …the only way I can fight is I gotta get in touch with that, ya feel me? Tell him like yo man shit…[inaudible] fuck tell them it was a misunderstanding ya know what I mean?
>
> CO-CONSPIRATOR 1: Mhmm.
>
> BROWN: So um, I'm wondering if you could um, look in uh, Facebook for the dude, ya heard me?
>
> CO-CONSPIRATOR 1: Yeah.
>
> BROWN: And uh, you already know.  Think you can you do that?
>
> CO-CONSPIRATOR 1: Mhm.
>
> BROWN:  It's important…and uh tell the dude like yo can you please call me?... both of 'em…the fat dude too[6], ya heard?  It's important like yo man, shit, nigga's cryin yo, can you do the right thing, get that thing notarized, ya know what I mean? [laughter]
>
> CO-CONSPIRATOR 1: [inaudible] stupid, I hear you, I know.
>
> BROWN: That's the only way, ya know what I mean…start uh, lookin for that now.

---

[5] The following, and all of the quotations herein, are based on preliminary transcriptions of jail calls involving BROWN.

[6] Based upon my involvement in this case and the investigation to date, I know that Victim D is overweight.

CO-CONSPIRATOR 1: Yeah….yup yup yup.

...

BROWN: This shit is crazy, you have to find dude now…fuck….it's my only option I gotta talk to these dudes yo like shit man why you doin' that, don't do that shit, fuck….gotta do that, ya know? Gotta do that…it shouldn't be hard to find right?

CO-CONSPIRATOR 1: It shouldn't.

BROWN: Get on that right now.

15. BROWN's reference to notarizing statements demonstrates that BROWN recognizes the importance of obtaining sworn testimony of the individuals he is directing Co-Conspirator 1 to contact.

16. In a separate recorded call on or about March 6, 2020, BROWN told Co-Conspirator 1 that "He said the only way for me to get out of this shit…whoever's the people is gotta recant, I don't know nothin' about that[7]…My boy [Co-Conspirator 3] said he spoke to the dude…what the fuck nigga', I gotta talk to that dude, just be real timid, like scary…like I said man, if I could speak to dude, ya know what I mean, if I could speak to dude, I know, ya know what I mean? I know, I know, if I could speak to the dude, I know, trust me, I know if I could speak to him..."

17. On or about March 6, 2020, Co-Conspirator 1 visited BROWN at the Wyatt Detention Facility. The visit was recorded, both via video and telephonically. Approximately twenty three minutes into their conversation, BROWN and Co-Conspirator 1 appear to muffle the receiver on their phones and continue conversing, in an attempt to obfuscate the content of

---

[7] I believe BROWN added this caveat in an attempt to minimize his knowledge of the victims and/or witnesses in the case and to hide the purpose of his veiled discussions with his Co-Conspirators. As discussed further below, BROWN's reference to "the dude" is a veiled reference to Victim D.

their conversations from law enforcement. Despite their efforts, BROWN can be heard audibly stating "the lawyer said it's the only way." Based on information obtained from staff at the Wyatt Detention Facility, video from the visit confirms that BROWN placed the phone on his shoulder and continued speaking with Co-Conspirator 1 through the glass partition. Approximately twenty eight minutes into the recorded visit, BROWN briefly began speaking into the phone again, while Co-Conspirator 1 continued conversing through the glass, stating "Them niggas will do it. Trust me. Trust me. Call them dudes and be like yo, please, you know what I mean?....I'm telling you, I'm telling you, like yo [laughter] I'm telling you, shit nigga notarize that thing, and send it, ya feel me? and send it, and then that'll be it, you know what I mean?" BROWN can be heard repeating various phrases, including "it's the only way" "they will do it" and "notarize it" despite his attempts to muffle the receiver throughout the duration of call. I believe the fact that BROWN and Co-Conspirator 1 were conversing outside of the recorded telephone line demonstrates that they knew what they were discussing was illegal.

18.   On or about March 6, 2020, BROWN also spoke with Co-Conspirator 2. Like Co-Conspirator 1, BROWN directed Co-Conspirator 2 to contact a victim and/or witness, as follows:

> BROWN: It's all bad for me right now bro, remember the person that called you right?...you need to holla at that nigga you hear me?…and tell dude like yo man ya know, this niggas about to go down for life man, like what the fuck man, help 'em out… go back tell the nigga yo, go back and tell them it wasn't… ya know what I mean? Ya heard? Think you can handle that?
>
> CO-CONSPIRATOR 2: Definitely.
>
> BROWN: Tell dude no hard feelings…no hard feelings, be nice ya know what I mean…think you can handle that?
>
> CO-CONSPIRATOR 2: Definitely, definitely could handle that.
>
> BROWN: I'm about to see if [Co-Conspirator 3] can help me out too. Alright so get on that, get on that for me [Co-Conspirator 2]…like please help bro out man,

you know, going down for life out this mothafucka, like please help him out, ya heard?

### III. BROWN Insinuates His Family Members and Associates Should Influence the Grand Jury Testimony of Person 3

19. On or about March 5, 2020, law enforcement agents served Person 3, also known as "Princess"[8] with a grand jury subpoena. BROWN was informed of this shortly thereafter and discussed it on a call with Person 4[9], stating in part, "these motherfuckas are goin' to people's houses that I don't even mess with no more tellin them that they gotta go to the grand jury….The girl that be at my father's, Princess…I ain't dealt with that girl since 2004, 5, 6, like yo!" Person 4 stated "When I see her, she said some shit I don't agree with." BROWN responded: "…Well my father know what it is, so he got it handled you know what I mean?"

20. In subsequent calls between March 7-10, 2020, BROWN made statements insinuating that he expects his family members and co-conspirators to influence Person 3. For example, on a call with Co-Conspirator 1, BROWN stated "My father need to make sure man, Princess is on point man, like what the fuck." The term "on point" is a colloquial term used to connote something is good, favorable, or attractive.

21. On another call with Co-Conspirator 1, referencing "Princess," BROWN stated "we gotta make sure that shit, we gotta make sure, like fuck." Co-Conspirator 1 repeated "…we gotta make sure, we gotta make sure that fucking…everything adds up, and everything, that's all it is, that everything fucking adds up…"

### PROBABLE CAUSE THAT FEDERAL CRIMES WERE COMMITTED

---

[8] The identity of Person 3 is known to the affiant but omitted herein to protect the confidentiality of ongoing grand jury proceedings. BROWN refers to Person 3 as "Princess", and Person 3 subscribes to her cell phone using the name "Princess."

[9] The identity of this individual is known to the affiant, but omitted herein to maintain confidentiality.

22.     As set forth herein, I have probable cause to believe that BROWN engaged in conduct constituting obstruction of justice and witness tampering by directing Co-Conspirator 3 to contact Victim D in an attempt to influence her testimony.

23.     On or about March 6, 2020, in the same call in which he spoke with Co-Conspirator 2[10], BROWN conferenced in Co-Conspirator 3 and conversed in part as follows:

BROWN: I'm stressed out man, I'm stressed out man, I need your help real bad…

CO-CONSPIRATOR 3: What do you need?

BROWN: Aight, hear me out carefully right? You know the dude right? You know the dude that was staying with you?[11]

CO-CONSPIRATOR 3: The dude?

BROWN: You know what I mean. Yeah, the dude. Remember?

CO-CONSPIRATOR 3: Oh yeah yeah yeah yeah yeah…

BROWN: I need you to call that dude right…however you gotta do it. Call the dude man and tell the dude please man they tryna give me damn near life man, ya feel me?

CO-CONSPIRATOR 3: Yeah, I had already, I had already hit her up this morning to be honest with you bro…that was the first thing I did this morning because it's just, I don't know nothing…

BROWN: That's why I'm telling you, just tell the dude…

CO-CONSPIRATOR 3: I hit her up this morning bro, I hit him up this morning.

BROWN: Just say yo there ain't no hard feelings dude, but help me out, like yo, the dude gotta know just write a letter say yo, misunderstanding, ya feel me? And get it notarized you know what I mean? No hard feelings, something like that, ya feel me? I really I really need help right now.

CO-CONSPIRATOR 3: Yeah, I was tryna not get into too much specifics over the phone…so I was tryna like, ya know, tryna get dude to meet me but I think she kinda thinks…

BROWN: That's what I'm saying…no hard feelings, ya know what I mean?

---

[10] Based upon my training and experience, inmates often direct individuals they are speaking with to conference in other parties in three way telephone calls, as there are restrictions on who inmates can call based upon their approved "contact lists."

[11] Based upon information provided to me in connection with this investigation, I know that Victim D stayed at CO-CONSPIRATOR 3's apartment for a brief period of time in 2018.

CO-CONSPIRATOR 3: Yeah but I think she knows that on your behalf but I don't think she knows that on my behalf.

BROWN: That's why I'm calling you.

….

BROWN: Can I get dude's number? Can I get dude's number?

CO-CONSPIRATOR 3: It's, it's Facebook bro.

BROWN: I know but tell dude I need the number, I need to talk to him. It's very important. It's very, very important.

CO-CONSPIRATOR 3: I'll get the number for you bro.

BROWN: Cause once I talk to dude I know I can finesse it, you know what I mean? I know I can finesse it. You know what I mean?

CO-CONSPIRATOR 3: Well when you talk to dude make sure you let him know he can trust me, and I want to keep dude close to me bro…

BROWN: Yes, yes, do that.

CO-CONSPIRATOR 3: …so if you could figure something out, like making sure dude can come down here and stay in my crib bro, until, at least until the trial is over bro.

BROWN: Yes. Yes. Yes. Ok, Ok.

CO-CONSPIRATOR 3: My whips[12] going to be on the road next month bro, I definitely took care of that shit bro, so my whips gonna be on the road next month so that's why I was trying to tell [Co-Conspirator 2] like yo bro, I need to know where exactly…I need to be pointed in the right direction.

BROWN: …Please get me dude's number, *please*, tell him I miss him and I really need to talk to him, just like that. Do that right now. I miss him, and I really need to talk to him. Just get the number.

CO-CONSPIRATOR 3: I got you, I'm on it, I'm on it.

24.     Notably, the gender of "the dude" changed from male to female multiple times over the course of the call. Further, Co-Conspirator 3's reference to getting his "whip" on the road and his need to be "pointed in the right direction" signifies that he is contemplating attempting to bring Victim D to his apartment to try to keep her there "until the trial is over."

25.     As directed by BROWN, Co-Conspirator 3 reached out to Victim D via

---

[12] The term "whip" is a colloquial or slang term used to mean a car or vehicle.

Facebook. On the same day, Victim D[13] reported the contact to law enforcement. I have reviewed screenshots of the messages between Victim D and Co-Conspirator 3.

26. In pertinent part, Co-Conspirator 3 stated:

Did you hear what happened to Arki…I was just curious if you were used somehow to get bro caught up but honestly I know how you feel about bro so I know you wouldn't do it…I'm asking for a little help…there's a few things I can't obviously say over the phone but some ppl you used to chill with and do business with I can't get to them but you can…he just called me and said he wants to talk to you and make sure you know there isn't any issues and he wants me to look after you…plz hmu sweetness and you put on some weight but you still look yummy.

27. On the same date, March 6, 2020, Victim D[14] spoke to Co-Conspirator 3 on a consensually recorded call. I have listened to a recording of the call. Based upon my review of the call, it was evident that Co-Conspirator 3 was highly aware of the possibility that his phone was being tapped or recorded, stating several times that there were things he did not want to say on the phone and that he could only communicate in person.

28. Co-Conspirator 3 also made clear that he was contacting Victim D at the direction of BROWN, stating he was "just doing what he [BROWN] asked me to do." Referring to BROWN, Co-Conspirator 3 told Victim D that BROWN "wants to make sure everything is good…he wants to make sure there's no bad blood."

29. Co-Conspirator 3 further stated that "He [Arki] wants to make sure you stay close to him until the case is over….He wants you to write a letter saying you guys are cool, you ain't got no beef, no drama."

---

[13] Victim D's record includes arrests for numerous offenses between 2010 and 2020 including various prostitution offenses (2019, 2014), larceny (2017), and driving under the influence (2020, 2010). The majority of these charges were dismissed. In a letter filed by Victim D's defense counsel, the government permitted Victim D's defense counsel to state that she was cooperating with a federal investigation involving BROWN. Ultimately, defense counsel's letter led to a recall of the bench warrant and a dismissal of summons.

[14] This reference to Victim D corresponds with Victim D in the indictment.

30. At one point, Victim D attempted to clarify what Co-Conspirator 3 was asking her to do. Victim D stated "So you're trying to get me to talk to people that…." Co-Conspirator 3 quickly cut Victim D off, acknowledging that there was the potential that the call was being tapped, stating "don't you know federal indictments is crazy man, I don't want to talk about this shit over the phone." He told Victim D that she "already got the idea but I don't want you to um… say that… put it in a different way, put it in a different way."

31. Co-Conspirator 3 further stated "At the end of the day if you're willing to work with him or whatever that does kind of help….At the end of the day just so there's no blood lost or whatever…"

32. He also made clear that BROWN would be told that he had spoken with Victim D, stating "He will know we talked so by Monday he probably expects you to reach out to him."

33. Notably, throughout the call, Co-Conspirator 3 continued referring to other individuals BROWN trafficked as "dudes", further highlighting BROWN's attempts to disguise the content of his conversations. Co-Conspirator 3 also specifically noted he could not be specific with "names, genders or locations."

34. For example, Co-Conspirator 3 stated "[BROWN] had this other dude running around…the dude was really, really, really inexperienced you know what I'm saying? And he put her, he put dude rather, he put dude in the carseat…so long story short like I didn't know the details of how their relationship worked, all I know this this dude would come around, I knew this dude was inexperienced, and this dude would try to come around and try to play the position." When Victim D tried to inquire about the identity of "the dude", Co-Conspirator 3 stated that he would not provide specifics over the phone, but again noted the person was inexperienced and lacked knowledge of "the game."

35.   On or about March 8, 2020, Co-Conspirator 3 contacted Victim D again to check in, stating in part, "what he asked me to do, I did it" and "I hope you would find it in your heart to just…whatever it is he asked you to do just to do it…I think it's just a letter…I think that's all it is…but you gotta understand he's on a federal line so I can't, I'm pretty sure he didn't want to get into specifics over the phone….I know that you guys care for each other…at the end of the day this is my man's life and his freedom." Victim D ended the conversation when Co-Conspirator 3 began attempting to ask her questions.

36.   Based upon my training and experience, I believe that BROWN directed Co-Conspirator 3 to contact Victim D with the intent to intimidate, threaten, and/or corruptly persuade her with the intent to influence this case and the administration of justice, by influencing her testimony in violation of 18 U.S.C. §§ 1503, 1512 (b)(1), (b)(2)(A), (c)(2).

37.   Further, Victim D believed the contact with Co-Conspirator 3 was meant to manipulate her into changing and/or recanting her sworn testimony in this case.

## Conclusion

38.     Based on the above, there is probable cause to believe that BROWN obstructed justice and engaged in witness tampering, in violation of 18 U.S.C. §§ 1503, 1512 (b)(1), (b)(2)(A), (c)(2).

Respectfully submitted,

_____
Kathleen Doyle
Task Force Officer, FBI

Sworn to me telephonically on March 26, 2020,

_____
HON. MARIANNE B. BOWLER
United States Magistrate Judge