UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | No. 20-cr-10041-PBS |
| BRUCE BROWN | |
| Defendant | |

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO RECONSIDER PRETRIAL RELEASE ON CONDITIONS BASED ON CHANGED CIRCUMSTANCES AND THE COVID-19 PANDEMIC

The United States of America, by and through its counsel of record, the United States Attorney for the District of Massachusetts and Assistant U.S. Attorney Mackenzie A. Queenin, hereby opposes the Defendant's Motion to Reconsider Pretrial Release on Conditions Based On Changed Circumstances and COVID-19 Pandemic, Dkt 55 (the "Motion").

The government appreciates the gravity of the COVID-19 pandemic. Nonetheless, the factors set forth in 18 U.S.C. § 3142 still must guide this Court in determining, on a case-by-case basis, whether pre-trial release is appropriate. In this case, each of the § 3142(g) factors weigh heavily in favor of detention. The government can readily demonstrate that Bruce Brown (hereinafter "Brown" or "the Defendant") presents a serious danger to the community, victims and witnesses, and is also a risk of flight. No conditions of release can assure the safety of the community or the victims and witnesses in this case or assure his appearance. Nor do Brown's claimed medical conditions shift the analysis in his favor. Therefore, the Defendant's Motion should be denied and he should continue to be detained pending trial.

1

## BACKGROUND

I.       **Facts**

On February 13, 2020, a grand jury returned a nine count Indictment against Brown.[1] Brown made his first appearance before the Court on February 19, 2020, and agreed to voluntary detention without prejudice.  *See* Dkt. 9.  On June 16, 2020 the grand jury returned a First Superseding Indictment, adding counts for Obstruction of Justice and Attempted Witness Tampering.  *See* Dkt. 38.  The facts and circumstances surrounding these charges, based upon the Defendant's actions while incarcerated, are set forth in full in the Complaint Affidavit of Task Force Officer Kathleen Doyle, attached hereto as Exhibit 1.[2]  *See* Exhibit 1, 1:20-mj-02263-MBB-1, Dkt. 2.

On July 21, 2020, the grand jury returned the Second Superseding Indictment.  The Second Superseding Indictment adds Muriel Close as a defendant, and charges her with two counts of Conspiracy to Commit Sex Trafficking.  It also charges Brown with an additional count of Conspiracy to Commit Sex Trafficking, and an additional count of Sex Trafficking by Force, Fraud, and Coercion, based on his trafficking of Victim E from October-December of 2019.

---

[1] Brown was charged in the Indictment with seven counts, including Conspiracy to Commit Sex Trafficking (18 U.S.C. § 1594(c)), Sex Trafficking by Force, Fraud and Coercion (18 U.S.C. §§ 1591(a)(1) and (b)(1)); Sex Trafficking of a Minor and by Force, Fraud, and Coercion (18 U.S.C. §§ 1591(a)(1) and (b)(1) and (2); Transportation of a Minor with Intent to Engage in Criminal Sexual Activity (18 U.S.C. § 2423(a)).

[2] The government will submit thirteen exhibits in support of detention.  References to exhibits submitted in support of this opposition are by exhibit number and page or paragraph, where appropriate, e.g., Exhibit _, p. _.  The government assumes the Court will have access to the Defendant's criminal history through the pretrial services report.

Ultimately, Brown faces eleven counts as follows: Conspiracy to Commit Sex Trafficking (18 U.S.C. § 1594(c))(Counts One and Two); Sex Trafficking by Force, Fraud and Coercion (18 U.S.C. §§ 1591(a)(1) and (b)(1)) (Counts Three, Five, Six, Seven, and Eight); Sex Trafficking of a Minor and by Force, Fraud and Coercion (18 U.S.C. §§ 1591(a)(1) and (b)(1) and (2)) (Count Four); Transportation of a Minor with Intent to Engage in Criminal Sexual Activity (18 U.S.C. § 2423(a))(Count Nine); Obstruction of Justice (18 U.S.C. § 1503) (Count Ten); and Attempted Witness Tampering (18 U.S.C. § 1512 (b)(1)) (Count Eleven).

## II.   Grounds for Detention

The government seeks detention of the Defendant on the following grounds:

- 18 U.S.C. § 3142(f)(1)(A) and (B), because the Defendant is charged with six violations of 18 U.S.C. §1591, for which a maximum term of imprisonment of life is prescribed[3];

- 18 U.S.C. § 3142(f)(1)(D), because the Defendant has been convicted of two or more State offenses that would have been offenses described in subparagraphs (A) through (C) of 18 U.S.C. § 3142(f)(1), if a circumstance giving rise to Federal jurisdiction had existed;

- 18 U.S.C. § 3142(f)(1)(E) because Counts Four and Nine of the Second Superseding Indictment involve a minor victim;

- 18 U.S.C. § 3142(f)(2)(A), because there is a serious risk the Defendant will not return to Court if released; and

- 18 U.S.C. § 3142(f)(2)(B), because the Defendant presents a serious risk of obstruction of justice.

Pursuant to 18 U.S.C. § 3142(e)(3)(E), the government holds a rebuttable presumption of detention, because the Defendant is charged with offenses involving a minor (Count Four, Count Nine).

---

[3] The Defendant also faces a maximum sentence of life imprisonment on the charges for Conspiracy to Commit Sex Trafficking, and Transportation of a Minor with Intent to Engage in Criminal Sexual Activity.

## LEGAL STANDARD

A defendant must be detained pending trial if the court determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community[.]"  18 U.S.C. § 3142(e).[4]  The government bears the burden of demonstrating that the defendant poses a danger to the community by clear and convincing evidence, or that the defendant poses a flight risk by a preponderance of the evidence. *See United States v. Rose*, No. 11-10062, 2012 WL 2500497, *1 (D. Mass. June 26, 2012) (Gorton, J.).  But where, as here, the offenses with which the defendant is charged involve a minor victim, a rebuttable presumption arises in favor of detention. 18 U.S.C. § 3142(e)(3)(E).   Once the presumption is triggered, the burden falls on the defendant to produce evidence in rebuttal.[5]  *United States v. Dillon*, 938 F.2d 1412, 1416 (1st Cir. 1991); *see* 18 U.S.C. § 3142(e)(3)(E).

In determining whether any conditions of release will reasonably assure the Defendant's appearance and the safety of any other person and the community, the Court must consider the factors set forth in 18 U.S.C. § 3142(g), which include: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger that the defendant's release would pose to any other person or the community.   Each of these factors strongly support Brown's continued detention.

---

[4] As noted by the Senate Judiciary Committee: "This reference to safety of any other person is intended to cover the situation in which the *safety of a particular identifiable individual, perhaps a victim or witness*, is of concern, while the language referring to the safety of the community refers to the danger that *the defendant might engage in criminal activity to the detriment of the community*."  S. Rep. No. 98-147, at 39 (1983) (emphasis added; footnotes omitted); *see United States v. Patriarca,* 948 F.2d 789, 792–793 (1st Cir. 1991).  Both are applicable here.

## ARGUMENT

### I.    THE DEFENDANT IS A SERIOUS DANGER TO THE COMMUNITY, A RISK OF FLIGHT, AND HE POSES AN OBSTRUCTION RISK

Each and every factor set forth herein supports the Defendant's detention, demonstrating that no conditions of release can assure the safety of the community, witnesses and victims, prevent obstruction of justice, or assure his appearance.

#### A.   Nature and Circumstances of The Charged Offense

The Defendant is charged with serious crimes, nine of which carry the potential for life imprisonment.  Indeed, the Defendant's estimated Guidelines sentencing range is 360-life, which reflects both the severity of the instant charges as well as his extensive criminal history. Additionally, the Defendant faces the possibility of multiple mandatory minimum sentences.  Sex Trafficking by Force, Fraud or Coercion, in violation of 18 U.S.C. § 1591(a)(1) and (b)(1), as charged in Counts Three, Five, Six, Seven and Eight of the Second Superseding Indictment carries a mandatory minimum sentence of 15 years.  Additionally, Sex Trafficking of a Minor, in violation of 18 U.S.C § 1591, even absent proof of force, fraud or coercion (which is what is charged here in Count Four), carries a mandatory minimum sentence of 10 years.  Finally, Transportation of a Minor with Intent to Engage in Criminal Sexual Activity in violation of 18 U.S.C. § 2423(a) carries the same 10 year mandatory minimum penalty.  The nature of the penalties the Defendant is facing undoubtedly create an incentive for the Defendant to flee or evade law enforcement.

#### B.   Weight of the Evidence

As set forth in the Second Superseding Indictment, there are five charged victims in this case, Victims A-E.  The victims span a fifteen year time period from approximately 2004-2019. Each of the victims will testify about Brown's methodical exertion and maintenance of control over them through his use of force, fraud, and coercion in connection with the charged offenses.

A Cooperating Witness has also been disclosed to the defendant. The government's investigation in this case is ongoing, as evidenced by the fact that the government has superseded the original Indictment twice in less than six months.

### C. History and Characteristics of the Defendant

The Defendant has an extensive criminal history evidencing numerous arrests and dozens of prior criminal convictions. Based upon the government's review of Brown's record, he has been charged with at least 52 felonies and 42 misdemeanors. Of those charges, he has been convicted of at least 11 felonies (including convictions for Assault and Battery, Possession with Intent to Distribute Class B and Class D substances, Distributing Class B Substances, and Conspiracy to Violate the Controlled Substance Act) and 28 misdemeanors, respectively. The Defendant also has approximately 19 failures to appear in his Massachusetts based cases alone, again underscoring the risk of his non-appearance.

The evidence in this case also suggests that the Defendant has ready access to firearms, despite the fact that he is not permitted to possess one. In the past six years alone[6], the Defendant has been involved with several incidents involving firearms, as set forth in Exhibits 2 through 6 and summarized below:

- A May 29, 2018 incident, during which Boston Police Department ("BPD") officers were investigating complaints of drug dealing from Brown's residence (99 Wayland Street). Officers on prior occasions had observed foot traffic consistent with drug activity. Officers conducted surveillance and observed Brown and two other individuals blasting music and drinking alcohol outside. Officers approached the group, and conducted a protective sweep. They located a .40 semi-automatic

---

[6] The government does not endeavor to analyze all of the Defendant's prior incidents involving firearms, and instead chooses to summarize only Massachusetts based incidents from the past six years.

firearm in the hallway of 99 Wayland Street.  One of Brown's associates on site, Individual 2[7], took responsibility for the firearm.  *See* Exhibit 2.

- A January 8, 2016 incident, during which BPD executed a search warrant at Brown's residence.  Officers found Brown, Brown's associate Asha Mondesir ("Mondesir"), Brown's minor daughter, and Mondesir's son in the residence.  Upon execution of the search, officers found a plastic bag of crack cocaine, a DigiWeigh scale, plastic bags, a bag of cash, a box containing 31 rounds of .40 ammunition, and paperwork referring to a .40 caliber firearm, among other items.  Brown was charged with Unlawful Possession of Ammunition, and Possession with Intent to Distribute a Class B Substance.  *See* Exhibit 3.

- An October 16, 2015 incident, during which BPD conducted a motor vehicle stop.  Brown was a passenger in the vehicle.  In the side compartment of the vehicle, within an arm's length from Brown, officers observed a tazer.  When Officers located the tazer, Brown stated he was "sorry."  He was charged with carrying a dangerous weapon.  *See* Exhibit 4.

- An October 3, 2015 motor vehicle stop conducted by BPD.  Brown was again a passenger in the vehicle.  Officers observed Brown making downward movements.  Officers conducted a search of the vehicle and discovered a jacket underneath Brown's seat.  When they attempted to remove the jacket, they discovered a .38 caliber loaded firearm in the jacket pocket.  Brown also had a Class B substance on his person.  Brown was charged with unlawful possession of ammunition, unlawful possession of a firearm, failure to keep a record of a firearm, and Armed Career Criminal level 3.  *See* Exhibit 5.

- An October 30, 2014 incident, during which BPD officers observed Brown seated in the passenger side of a vehicle.  Officers observed a woman approach the vehicle and hand Brown cash, and also observed Brown hand her an object.  Officers followed the vehicle Brown was seated in.  The driver and Brown parked and exited the vehicle.  When approached by BPD, Brown denied that he was ever in the vehicle.  Officers observed a backpack in the front passenger side of the vehicle.  Officers searched the backpack and located a .40 caliber firearm with an obliterated serial number, loaded with 10 rounds of ammunition as well as an extra magazine.  Brown admitted the firearm was his.  Brown was charged with unlawful possession of a firearm, unlawful possession of ammunition, and possession of a large capacity feeding device.  *See* Exhibit 6.

Further, the government has obtained text messages exchanged between Brown and a defendant in an unrelated case, *United States v. Donell Phillips*, 1:19-cr-102-80-PBS-1.  The text

---

[7] The reference to Individual 2 is the reference to the same individual referred to as Individual 2 in the Government's Motion to Show Cause (filed under seal on July 30, 2020).

messages sent by Brown to Phillips include a photograph of two firearms and references to the firearms.  *See* Exhibit 7.

The Defendant also does not have, nor has he ever had, steady legitimate employment.  To the government's knowledge, over the past fifteen years, the Defendant has not held a job —aside from selling women for sex—for more than a month.[8]  Additionally, the Defendant recently expressed an unwillingness to work in prison.  *See* Exhibit 8, at p. 35 (a copy of the Defendant's medical file from the Donald W. Wyatt facility).  Finally, the Defendant has a self-reported issue with alcohol.  Brown's medical records confirm that he was "detoxing" from alcohol upon his intake.  Exhibit 8, at p. 3, 5, 7.

### D.  The Nature and Seriousness of the Danger to Any Person or the Community if the Defendant Were Released

The very nature of the sex trafficking charges, based in large part on victim testimony, demonstrate that the Defendant poses a risk to the victims and witnesses in this case.[9]  The Defendant clearly recognizes the importance of victim testimony, as underscored by his Obstruction of Justice and Attempted Witness Tampering charges.  *See* Exhibit 1, ¶¶, 16, 17 (noting that the Defendant stated on recorded jail calls that he would rather be "fighting [the

---

[8] The government expects that the Defendant will informed pre-trial services that he worked at the Encore Casino.  Based upon bank records, it appears he only did so for two pay periods.  The Defendant may also contend that he has a snow removal and landscaping company, which, to the government's knowledge, has never generated any revenue and is a shell company.

[9] The Defendant will allege that he does not know the names of the victims, since the government has declined to name them at this time out of concern for their safety.  While the government certainly believes there are many more individuals who have been victimized by the Defendant, it is simply not credible that the Defendant is unable to deduce any information surrounding the victim's identity, based upon the discovery produced to date, as well as the time periods and locations charged in the Second Superseding Indictment.  This is evidenced by the fact that one of the Defendant's co-conspirators did in fact reach out to Victim D.

charges] in the streets" and that talking to the victims is his "only option" and "the only way for me to get out of this shit."). If released, there are no conditions which would deter the Defendant from implementing what he refers to as his "Plan B." *See* Exhibit 1, ¶ 8 fn. 2. Indeed, the Defendant was undeterred even while incarcerated and speaking solely on recorded lines. *See* Exhibit 1.

As set forth in the Government's Motion to Show Cause, the Defendant is also wholly unable to comply with even the most basic of Court orders while incarcerated, again, knowing that his calls are recorded. Despite an Order from this Court to not have contact with Individual 2, the Defendant contacted Individual 2 approximately 29 times in a 30 day period. This was not a mistake. Indeed, as set forth in the Government's Motion to Show Cause, the Defendant explicitly acknowledged he knew he was not supposed to have contact with Individual 2. Releasing the Defendant would leave the government with essentially no way to monitor the Defendant's actions.

Furthermore, the Defendant makes no effort to show that, if he were released, he would not continue to pose a serious danger to the community. The Defendant's criminal history, and the summarized incidents set forth above (which are only examples from the past six years) underscore the Defendant's ready access to and involvement with firearms—despite the fact that he is a convicted felon and not permitted to possess them.

The Defendant proposes release, but he does not propose—because there is simply no practical way to impose or enforce—a limitation on his access to landline phones, computers, smartphones, and other digital communication devices. Moreover, GPS monitoring is not appropriate in this case. As the Court knows, GPS monitors can be tampered with or removed. And the real danger to victims and witnesses here is not only the Defendant's actions and

whereabouts, but also the Defendant directing his associates to act on his behalf.  As other courts have observed when denying release to dangerous defendants, "location monitoring is not a limitless resource, nor is its installation and monitoring by United States Pretrial Services officers without risk to those personnel (who must be trained and certified to install location monitoring) given the current recommendations regarding implementation of social distancing." *United States v. Martin*, No. CR PWG-19-140-13, 2020 WL 1274857, at *4 (D. Md. Mar. 17, 2020).  As such, releasing this Defendant on a GPS bracelet would impose a further burden on the already strained resources of pretrial services and federal and local law enforcement.  That burden is simply not justified in a case like this one.

Based on all of the above factors, the Defendant presents an overwhelming a danger to the community and to individuals if released, and is also a risk of flight and obstruction, therefore he must be detained.  Detention is the only way to prevent the Defendant from committing further obstructionist crimes, to ensure the safety of the public, witnesses and victims, and to assure the Court that the Defendant will return to answer to the charges.

## II.      THE COVID-19 VIRUS DOES NOT COMPEL THE DEFENDANT'S RELEASE

The Defendant's Motion sidesteps the statutory factors that guide the Court's detention analysis, and instead argues for release primarily on the basis that COVID-19 is dangerous.  *See* Motion, at 10.  However, the COVID-19 pandemic, while undoubtedly serious, has not changed the facts and circumstances particular to the Defendant that demonstrate his risk of danger to the community, risk of flight and obstruction, therefore it does not warrant his release.

The Defendant's argument for release relies primarily on the Defendant's reported fears about contracting COVID-19 at the Donald W. Wyatt ("Wyatt") facility.  However, the Defendant's speculative concerns about the risk to his health do not alter the 18 U.S.C. § 3142(g)

calculus that weighs heavily in favor of detention, particularly in light of the extensive precautionary measures that Wyatt has taken to reduce the risk of transmission.  *See* Exhibit 9 (July 31, 2020, Wyatt COVID-19 status report).

### A.  The Defendant's Risk of Contracting COVID-19 Is Not A Compelling Reason For Release

The Defendant does not appear to currently suffer from any serious medical condition that would make him particularly susceptible to complications from COVID-19.  But, even if he did have or develop such a condition, he has not demonstrated that the risk of contracting COVID-19 at Wyatt outweighs the risk he poses were he to be released.  *See United States v. Akula*, No. 19-cr-30039-MGM, 2020 U.S. Dist. LEXIS 113734, at *8 (D. Mass. June 29, 2020)("[T]he court is not unsympathetic to the risks posed to all inmates held at Wyatt during the pandemic, but those risks do not outweigh the risk of flight and danger to another that would be posed by his release.")(quoting *United States v. Diaz Fontanez*, No. 1:19-10421-DPW, 4:19-40003-TSH, 2020 WL 2475648, at *2 (D. Mass. May 13, 2020)); *United States v. Pereia*, 19-cr-10446, Dkt 60 (D. Mass., April 13, 2020) (ordering detention "notwithstanding Mr. Pereia's vulnerability" to the coronavirus due to his serious medical issues, because "the court finds the danger of him being incarcerated during the present pandemic do not outweigh his risk of flight or danger to the community.")(aff'd Dkt. 72, Stearns, J.)

The Defendant has submitted no medical records in support of his release motion.[10]  His Motion argues that he is prediabetic, has high cholesterol, that he has suffered from asthma, and that he has hypertension.  *See* Motion, at 2.  The government addresses each of these cited conditions in turn.

---

[10] As referenced above, the government attaches the full file as Exhibit 8.

First, prediabetes is not a "high" or "increased" risk factor for COVID-19.[11]   But as a preliminary matter, the Defendant's medical records do not support a conclusion that he is in fact pre-diabetic.  The normal range of hemoglobin A1C, according to Wyatt's form, is less than 5.7. Brown's hemoglobin A1C on a single occasion was 5.8, a mere .1 higher than what Wyatt deems "normal."  Similarly, according to the CDC, having high cholesterol does not place an individual in the "high" or "increased" risk category.

The Defendant also argues, again without any supporting records, that he suffers from a history of asthma.   Notably, the Defendant did not claim to have asthma when he filled out his medical intake forms on February 19, 2020, prior to the widespread emergence of COVID-19 in the United States.  Exhibit 8, p. 3.  The lack of any clinical support whatsoever for his alleged asthma diagnosis was expressly noted by physicians at Wyatt on April 12, 2020.  Exhibit 8, p. 40 (stating "Though patient claimed to have a history of asthma, **this was denied in intake**.  He has not used a rescue inhaler in many years but insists he needs one now – **no clinical indication that this is needed**.")(emphasis added).  To be clear, Brown concedes in his filing that he has not used an inhaler "in many years."  But in a recorded jail call from May 30, 2020, the Defendant revealed

---

[11] The CDC states that the following conditions place individuals in the "high risk" category for COVID-19: cancer, chronic kidney disease, COPD, immunocompromised state from organ transplant, obesity, serious heart conditions, sickle cell disease, and Type 2 diabetes. The Defendant has none of these conditions.  The CDC notes that the following conditions place individuals in the "increased risk" category for COVID-19: asthma (moderate to severe), cerebrovascular disease, cystic fibrosis, hypertension/high blood pressure, immunocompromised state from blood or bone marrow transplant, HIV, use of corticosteroids, neurologic conditions, liver disease, pregnancy, pulmonary fibrosis, smoking, Type 1 diabetes, and thalassemia.  The Defendant alleges he has asthma and hypertension, but offers no evidence that he is currently suffering from either.

the truth and stated he actually has "never" used an inhaler.  Exhibit 10, at 19:30 ("I ain't never got no asthma pump before.")

The Defendant also claims to currently suffer from hypertension.  On April 12, 2020, Wyatt's physician noted that the defendant's reports concerning his alleged history of hypertension were "very vague regarding where he was evaluated, what medications were prescribed."  Wyatt also noted on the same date that although Brown reported that he had hypertension "he has no known sequelae related to HTN."[12]  Wyatt nonetheless prescribed the defendant medication. Based upon the defendant's medical file, any concerns related to his high blood pressure appear to be addressed by medication the Defendant has been taking.  Indeed, his most recent recorded blood pressure reading on June 28, 2020, after beginning his medication, was 125/84.[13]  This does not qualify as hypertension.

Further, based upon the Defendant's recorded jail calls, it strains credulity to believe he is concerned about contracting the coronavirus.  The Defendant has stated that he has not been wearing his mask and/or has not been wearing his mask properly.  *See e.g.*, Exhibit 11, at 12:00 (recorded jail call from April 16, 2020) ("You been wearing your mask?" "No"); Exhibit 12, at 4:10 (recorded jail call from April 27, 2020) ("You got your mask on?" "It ain't on, but it's hanging off the side of my ear"… "Well you know gotta keep that on" "Yeah yeah, that don't make sense these mothafuckers been around me for over a month now…").  The Defendant has also renounced social distancing, stating "I'm not social distancing, that is so stupid, that is so dumb man, that

---

[12] HTN is a medical abbreviation for hypertension.

[13] According to WebMD, high blood pressure is classified as "hypertension" when an individual's blood pressure levels are higher than 130/80.  *See* https://www.webmd.com/men/ guide/high-blood-pressure#2

shit's dumb, they don't know what the fuck they doing man."  Exhibit 13, at 3:30 (recorded jail call from April 26, 2020).

Finally, the government notes that several judges that have addressed similar motions have denied release, even in the face of claimed individualized health risks.  *See e.g., United States v. Raekwan Paris*, 19-10459-RWZ, Dkt 864 (D. Mass., May 5, 2020)(denying release of defendant who claimed to have hypertension in light of § 3142(g) factors); *United States v. Angel Rodriguez*, 19-10459-RWZ, Dkt. 851 (D. Mass. May 1, 2020)(denying release of defendant who claimed to have asthma and other medical conditions, in light of § 3142(g) factors)*; United States v. Semaj Leary,* 19-CR-10474-DJC*,* Dkt 38 (D. Mass., May 1, 2020)(denying release of defendant who contracted a "presumptive positive" case of COVID-19 and claimed to suffer from childhood asthma, stating the risk to the defendant must be balanced with the risk to the public if the defendant was to be released, and noting in particular the defendant's criminal history); *United States v. Cornieles*, 19-MJ-02569-MBB, Dkt. 22 (D. Mass. April 16, 2020)(denying release of defendant who claimed asthmatic condition but produced minimal documentation that failed to show he currently suffered from acute asthma).   Ultimately, even if the Defendant had demonstrable "high" risk conditions, they would not tip the scale in favor of his release, in light of the § 3142(g) factors.

### B. The Defendant Has Not Shown that Wyatt's Precautionary Measures Are Inadequate To Mitigate the Risks of COVID-19 to Detainees Even if He Did Have Serious Medical Conditions or Contracts Coronavirus

Nor can the Defendant establish that his risk of COVID-19 is a compelling reason to release him from detention when he is housed at a facility that has taken extensive precautionary measures to mitigate the risk.  The government agrees that COVID-19 presents a public health emergency. All facets of national, state, and local government have turned their focus to slowing the spread of the outbreak, protecting the health and safety of the community, and addressing the medical needs

of those who have contracted the virus. That focus and attention includes authorities and staff at Wyatt.

The government will not restate the entire scope of Wyatt's efforts here, which involve, for example: screening of new detainees, 24 hour onsite medical personnel, testing, frequent cleanings, quarantine procedures, screening of all those who enter the facility, extensive procedures in the event of positive cases of COVID-19, contact tracing, isolation, and, if necessary, transportation to a medical facility. *See* Exhibit 9. According to Wyatt's July 31, 2020 status report, the facility is currently only operating at 68% capacity. Nonetheless, testing is extensive and available. Approximately 2,143 tests have been conducted on 522 inmates.[14] Further, there is only a single active case amongst detainees, and a single active case among staff. *See* Exhibit 9. Notably, the Defendant does not claim that he would not be able to receive adequate care at Wyatt if he were to contract the virus.[15]

### C. The Defendant's Proposed Release Would Not Mitigate the Risks of COVID-19

The Defendant also does not show that his proposed plan for release would mitigate his risk of contracting COVID-19, as compared to the risk he faces while detained at Wyatt. In contrast to Wyatt, it is highly unlikely that individuals who visit the Defendant's proposed residence will be screened for COVID-19 prior to his interactions with them. There is no reason

---

[14] The Defendant cites to dated statistics in his Motion, noting that as of May 4, 2020, only a quarter of detainees had been tested. This information is stale and therefore irrelevant.

[15] *See United States v. Rebollo-Andino*, 312 F. App'x 346, 348 (1st Cir. 2009) (declining to reverse denial of motion for release based on health conditions under 18 U.S.C. § 3142(i) where the defendant did not identify any specific medical conditions and failed to "explain why his detention would prevent him from obtaining adequate treatment" for any condition that he did have).

to believe that the Defendant's risk of contracting the virus would be any lower while released than if he were to remain detained at a facility which has implemented exhaustive precautionary measures to reduce the risk of infection to all inmates.[16]

### **CONCLUSION**

The Defendant presents a significant danger to the community, a risk of flight, and a serious risk of obstructing justice.  No conditions can assure the safety of the community, prevent the obstruction of justice, or assure the Defendant's return to Court.  As such, the Defendant must be detained.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:     */s/ Mackenzie A. Queenin*
Mackenzie A. Queenin
Assistant U.S. Attorney
United States Attorney's Office
1 Courthouse Way, Suite 9200
Boston MA 02210

---

[16] *See United States v. Lunnie*, No. 4:19-CR-00180 KGB, 2020 WL 1644495, at *5 (finding that the proposed release to home confinement was not "necessary" for a compelling reason under Section 3142(i) where it was not "tailored to mitigate . . . the defendant's overall COVID-19 risks," including because the defendant did not show that adequate COVID-19 precautions would be taken at his home and there was thus "nothing more than speculation that home detention would be less risky than living in close quarters with others" in jail, "which at least has screening practices and other reasonable COVID-19 precautions in place").

<u>CERTIFICATE OF SERVICE</u>

      I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                      */s/ Mackenzie A. Queenin*
                                        Mackenzie A. Queenin
                                        Assistant U.S. Attorney

Date: August 4, 2020