UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) 1:20-cr-10041-PBS |
| v. | ) |
| | ) |
| BRUCE BROWN a/k/a "Arki" | ) |
| | ) |
| Defendant. | ) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Since at least 2004, the defendant, Bruce Brown a/k/a "Arki" ("Brown") has devastated the lives of his sex-trafficking victims. They had difficult lives before they met him. He saw that. He used that. And he made it worse.

On November 1, 2021, Brown pled guilty to a portion of the Second Superseding Indictment pursuant to a Rule 11(c)(1)(C) plea agreement. Specifically, Brown pled guilty to two counts of conspiracy to commit sex trafficking, in violation of 18 U.S.C. § 1594(c), sex trafficking of a minor, in violation of 18 U.S.C. §1591(b)(2), transportation of a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 2423(a), obstruction of justice, in violation of 18 U.S.C. §1503, and witness tampering, in violation of 18 U.S.C. § 1512 (b)(1). For the reasons set forth herein, and as set forth in the plea agreement, the government recommends a sentence of principally 138 months incarceration.

**I.  Factual Background**

The government adopts the statement of facts as set forth more fully in the Pre-Sentence Report ("PSR"). PSR ¶¶ 7-30. As early as 2004, Brown began forcing victims to work for him as prostitutes. PSR ¶ 8. As a serial pimp, he targeted those that were particularly vulnerable and transient—a drug addict, a domestic abuse survivor, a prior trafficking victim, and a minor. PSR ¶ 8. He used a variety of methods to lure these victims into his web, and employed expertly tailored

techniques to keep them there. PSR ¶¶ 9, 73. He did so in order to pad his wallet with money they earned by performing sexual favors against their will. PSR ¶¶ 9, 22, 73. Brown used psychological manipulation, including monitoring his victim's whereabouts and communications with other people in an attempt to further isolate them and detach them from any support network. PSR ¶¶ 9, 22. Brown also displayed his control through other methods. For example, he physically beat Close, his co-conspirator, in front of victims, including Victim D, a domestic violence survivor and in front of Victim B, a minor. *See* PSR ¶¶ 10, 22 (Victim B noted "[h]e would turn the tub, shower on, the bottom one, and grab her by the hair, and bring her under the water so she can[not] breathe, take her back out and yelling at her, and put her back in the water, or hitting her, punching her.")

But Brown's victims were not spared from their own episodes of physical abuse or threats of violence either. PSR ¶¶ 9, 22, 73 (noting that Victim A estimated Brown was physically violent with her on more than twenty occasions and that he threatened to find her and kill her if she left). Brown also carried firearms and made his access to firearms known. PSR ¶ 22. Like many pimps, Brown demanded his victims follow certain "rules" while meeting with customers.[1] PSR ¶¶ 12, 16.

After Brown was charged for his actions, his recalcitrance continued. He attempted to obstruct justice and tamper with his victims' testimony. On recorded prison phone lines, he unabashedly directed co-conspirators to execute what he dubbed "Plan B", a plan to contact victims in an attempt to get them to alter or recant their testimony. PSR ¶¶ 23-30. Brown boasted about his ability to psychologically manipulate Victim D, stating he knew he could "finesse it."

---

[1] Minor Victim B recalled that she had to "take the money first" "ask if they have a condom", "close the door" and "I have to- you know, have sex." PSR ¶ 16. Victims were also not allowed to look at other men or use cell phones in Brown's presence. PSR ¶ 12.

PSR ¶ 28. Indeed, one of his co-conspirators contacted Victim D and informed her that Brown wanted her "to write a letter saying you guys are cool, you ain't got no beef, no drama." PSR ¶ 29. He further stated that "At the end of the day if [Victim D] was willing to work with him" "that does kind of help….At the end of the day just so there's no blood lost or whatever…" PSR ¶ 29.

## II.     Guidelines

Both the PSR and the Rule 11(c)(1)(C) plea agreement calculate the defendant's guidelines range as 360-life. *See* Dkt 187, PSR ¶ 71. While the U.S. Probation Department ("Probation") and the government arrived at those guidelines by slightly different routes, and calculated offense levels of 39 and 40, respectively, the difference does not matter for guidelines purposes. *See* Dkt 187, PSR ¶ 184. Both Probation and the parties agree that Brown's criminal history points place him in Criminal History Category VI. *See* Dkt 187, PSR ¶ 184. Should the Court accept the plea agreement, the parties agree on a term of incarceration of 138 months, 48 months supervised release, and a mandatory $600 special assessment. *See* Dkt 187. The government is not seeking restitution or forfeiture.[2]

## III.    Sentencing Recommendation Pursuant to § 3553(a)

### a.  Nature and Circumstances of the Offense

It is impossible to overstate the impact the defendant's conduct has had upon each of his victims. This wasn't a crime committed from behind a computer screen. This was not an anomaly; it was not a one-time mistake or an ill-fated choice. This crime was personal. It was hands on. And it was deliberate. Brown purposefully targeted girls and women that he knew would be susceptible to his tactics—girls and women that were vulnerable. His victims were drug addicts,

---

[2] The government informed the victims of their right to seek restitution, and each has declined to pursue it. The government lacks a sufficient factual basis to reasonably calculate a restitution amount.

teenagers, those who were down on their luck. He lured them with promises of a relationship, of money and of a better life. Then he took the SIM cards out of their phones. He carried guns around them. He beat them and beat others in front of them. And when he was caught, he doubled down by enlisting co-conspirators to get the victims to change their stories. Our society cannot and will not tolerate this type of conduct, especially the exploitation of a minor, a 16 year old. The nature and circumstances of this offense mandate a significant incarcerative sentence to reflect the lasting and immeasurable damage the defendant has caused his victims.

### b. Specific and General Deterrence

A significant sentence of 138 months is necessary to deter the defendant from choosing to traffic victims again, however easy and lucrative it may be to fall into his old habits upon his release. Despite his 43 years, the PSR reveals that Brown has essentially no work history. PSR ¶¶ 174-179. The reason is simple. Instead of choosing to earn an honest income, he chose to profit off of human suffering.[3] Upon his release from prison, Brown will again be faced with this same choice.

Specific deterrence is also critical because Brown, through at least three different arenas, has demonstrated that he lacks any respect for the law. First, Brown's criminal history is longstanding and serious, as evidenced by his CHC VI. His record spans over 25 years. PSR ¶¶ 75-82. Aside from the instant offense, perhaps most troubling are Brown's convictions for distribution of cocaine, grand theft auto, possession of firearms, and assault and battery. PSR ¶¶ 87, 94, 97, 105. Second, Brown's "Plan B" — his attempts to contact and manipulate victims into

---

[3] The PSR details that Brown was employed for a week an Encore casino, and that he allegedly had a snow removal business which provided him with "sporadic" jobs. PSR ¶¶ 174-179. Notably, Brown also alleges that during the years he was trafficking women, he was supported by unidentified "family and friends." PSR ¶¶ 174-179.

changing or recanting their testimony while incarcerated, demonstrate that he continued to believe he was above the law even after he was indicted in this case. He was emboldened, he chose to direct his obstruction and witness tampering on monitored and recorded jail lines in hopes that either it wouldn't be discovered or that no one would care if it was. Third, Brown's callous disregard for the truth and disrespect for federal law enforcement and this Court continues in his pre-sentence interview, as documented in the PSR. As demonstrated by the government's objections to the PSR and the wild inconsistencies between the defendant's bail interview, his family members' interviews, and his pre-sentence interview, the defendant does not hesitate to inexplicably lie about anything he thinks could somehow marginally serve him, even after pleading guilty. *See* PSR ¶¶ 147a, 148, 149 (contrasting the defendant's pre-sentencing contention that two women were his paternal half-sisters, with the defendant's bail interview statements to the contrary, with the defendant's family member's pre-sentence contentions to the contrary, with the government's investigation that revealed one of the women was his "girlfriend" and the other was a love interest with whom he exchanged dozens of sexually explicit messages)[4]; PSR ¶¶ 157, 165-166, 178 (contrasting defendant's reports of drug addiction with the defendant's prior bail interview with the defendant's uncle's statement that has no knowledge of the defendant's drug use).

      General deterrence is also important. Sex trafficking cases are difficult to investigate. They are incredibly time intensive and require law enforcement to locate and interview victim witnesses, witnesses who are often too afraid or traumatized to provide information necessary for prosecution. These individuals fear not being believed, or worse, they fear that society views them

---

[4] Although the motive for this lie is unclear, the government suspects it has something to do with ongoing DCF proceedings and an attempt to determine the appropriate custodian for Brown's daughter.

as not worthy of the protections of the criminal justice system. Traffickers know that with all of these challenges, to both the investigation and potentially at trial, they are unlikely to be detected, investigated, and prosecuted. *See, e.g.*, Maine Advisory Committee to the U.S. Commission on Civil Rights, "Human Trafficking in Maine" (Feb. 2017) at 20 (noting that, one of the greatest difficulties facing prosecutors in human trafficking cases is the difficulty securing testimony from victims), *available at* https://www.usccr.gov/pubs/docs/Human-Trafficking-in-Maine.pdf.

Additionally, in the sex-trafficking world, the defendant and those like him, understand that the victims assume most of the risk of criminal prosecution and physical violence. The defendant, like other traffickers, sent his victims out to meet with customers in hotel rooms and apartments, risking discovery by law enforcement, or worse, violence from the customers. A sentence of 138 months sends a strong signal to these traffickers and would-be traffickers that sex trafficking is not a risk free business opportunity. It will convey that when they are caught, they will be prosecuted and given a serious prison sentence for the damage they have done to these victims and the community.

    c. **Protection of the Public**

As discussed, *supra*, this was not a one-time offense. Were it not for law enforcement's efforts, the defendant would still be fully operational, and likely recruiting new victims. He was not a young man who made a bad decision based on a tight financial circumstance. He willingly continued this conduct into his forties. A sentence of 138 months is appropriate to protect the public from this defendant.

IV. **Conclusion**

To reflect the seriousness of Brown's crimes, their impact on his victims, and to deter him and others from committing similar offenses, a lengthy sentence is required. The parties' joint

recommendation of 138 months of incarceration, 48 months of supervised release,[5] and a $600 special assessment is sufficient, but not greater than necessary to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

RACHAEL S. ROLLINS
United States Attorney

/s/ Mackenzie A. Queenin
Mackenzie A. Queenin
J. Mackenzie Duane
Assistant U.S. Attorneys

---

[5] The parties binding plea agreement calls for a joint recommendation of 48 months of supervised release. That recommendation was in error however, because the statute requires a mandatory minimum term of supervised release of 60 months. *See* PSR p. 57; 18 U.S.C. § 3583(k). The government nonetheless recommends a supervised release period of 48 months.

CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on February 7, 2022.

/s/ *Mackenzie A. Queenin*
Mackenzie A. Queenin